## Case No. 2,435.

CARR v. GALE et al.

[3 Woodb. & M. 38.][1]

Circuit Court, D. Maine. May, 1847.

BANKRUPTCY — ACTION BY ASSIGNEE — JURISDICTION—EVIDENCE OF CONVERSION—DECLARATIONS —NEW TRIAL—BOOKS AND PAPERS — LIABILITY OF BANKRUPT FOR TORT—RIGHTS OF ASSIGNEE.

1. An action of trover by an assignee, for property supposed to have belonged to a bank-

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

rupt, lies in the circuit court against another claiming the title, and the bankrupt aiding him.

2. Possession by the bankrupt, when his property was assigned, and a removal and sale of it, in connection with the other defendant, afterwards, is prima facie evidence of conversion.

3. The declarations of the bankrupt are competent evidence against him, in such an action.

4. Explanations and schedules attached to his petition for bankruptcy, are competent evidence for him, as a part of the petition, but should not be allowed weight in his behalf; and if they are excluded, it will be no ground for a new trial.

[Cited in Whetmore v. Murdock, Case No. 17,509.]

5. Nor is it sufficient ground for a new trial if the verdict is against the weight of evidence, provided some existed on both sides, which was contradictory, and it does not clearly appear that the verdict was given by mistake, or any wilful abuse of power.

6. Books and papers produced under a notice, must be brought in and allowed to be used by the other side, unconditionally, else parol evidence of their contents is competent.

7. Actions for property may be brought by an assignee, when it is alleged to have been conveyed fraudulently, which could not have been sustained by the bankrupt.

[Cited in Whetmore v. Murdock, Case No. 17,509.]

8. The want of property by the latter is no defence to an action against him for a tort, and he may be liable for a tort committed on what was his own property when he went into bankruptcy.

9. Property held in trust by a bankrupt passes into the control of the assignee, till another trustee is appointed.

[10. Cited in Payson v. Dietz, Case No. 10,861, to the point that state courts are not deprived of jurisdiction in ordinary common-law and equity suits simply because brought by an assignee in bankruptcy.]

(The following report of the case tried before WARE, J., was drawn up and agreed to by the counsel in the cause.)

At law. This was an action of trover [by Joshua W. Carr, assignee in bankruptcy of Samuel C. Hemmenway, against Samuel C. Hemmenway, Stephen Gale, and others], for a quantity of goods, &c., mentioned in the plaintiff's writ, which writ may be referred to. The plaintiff introduced a copy of the decree of the district court, for Maine district, sitting in bankruptcy, declaring said Hemmenway bankrupt; and also a copy of the decree of said court appointing the plaintiff the assignee, both of which may be referred to and made a part of the case.

The plaintiff then called William S. Warren, who testified that he had been intimately acquainted with the defendant, Hemmenway, for six years past, and knew him before that; that he kept a store where the same kind of goods were kept which Hemmenway kept; that the store in which the witness kept, in 1840, 1841 and 1842, was about ten rods from said Hemmenway's store; that Hemmenway traded in No. 1 Maine street, in Bangor, being the bank building, so called, from 1838 to the fall of 1842, in selling his goods, which consisted of hats, caps, furs, &c.; that during the months of April, May, June and July, he had such goods in his store in Bangor as are named in the plaintiff's writ, or of the kind and value named in the bills which he held in his hand, and which counsel agreed were the same named in the plaintiff's writ. The said bills may be referred to and are a part of the case. That, in the fall of 1842, he moved from No. 1, to No. 19, West Market place, which was the next door; that he was engaged, during the time, in selling said goods, and that he subsequently removed from this No. 19 to the opposite side of the street, and that witness never observed any apparent change in the mode or manner of his doing business. On cross-examination, he stated that Hemmenway's sign over the door, was "S. C. Hemmenway," in large letters, with the word "Agent" put in small, diminutive letters; that the whole word "Agent" was not more than three inches long, and about one half inch in width; that he kept beside the defendant one year before he discovered the word "Agent" on his sign; that he signed his name "S. C. Hemmenway, Agent," in all his business which he knew anything about. He also testified, that after his removal into the store in West Market place, the sign over the door was "Thomas Hersey;" and afterwards, the name of "William H. Hemmenway" was put up upon it. He subsequently, and after the defendant had gone through with his proof, stated that the profits on such goods as kept by Hemmenway, was twenty-five per cent., in the winter, and twenty per cent., in the summer.

John B. Norris was next called by the plaintiff, and interrogated as to the business in the store of Hemmenway & Hersey, in 1844, which was objected to by defendants, but was admitted; and he testified that he went into the store of Hemmenway & Hersey in the spring of 1844,—left about a month since. Can't state the amount of stock. In the fall of 1844, stock was $30,000. Had in their employ, last winter, about thirty men. Can't say what William H. Hemmenway was doing; not in store one-tenth of the time. Sam and Hersey had done all the business. Have seen William sell a very few articles. He bought some furs for the store, last winter. Don't know whether Hemmenway & Hersey, or Richardson, employed the men. Understood that William was a member of the firm —not from any of the partners. For a greater part of a few weeks, last winter, William was making buffalo robes.

George L. Gibson was next called, and testified that he was employed in Laban Hersey's store during the time he was in business in No. 19, about three months, till he sold out, sometime in July or August, 1844, to Jos. Bryant & Son. Groceries came from Ingalls and Hersey's, and about the city; some of the goods came from Hemmenway & Hersey's store. S. C. Hemmenway took some interest in Laban Hersey's sale, as he would in the sale of Hemmenway & Hersey's·

stock. The witness was here objected to by defendants and stopped.

O. H. Ingalls was next called by the plaintiff, and he stated that Hemmenway had been engaged in trade in Bangor from the year 1838 to September A. D. 1842, when he moved into No. 19 West Market place, it being the next door, and where the witness had kept his store; that during the months of April, May, June and July of 1842, the defendant, Hemmenway, had such goods in his store, and he sold them during that time, as are mentioned in the plaintiff's writ; and witness has never seen any apparent change in his business; that the word "Agent" was upon the sign in small, diminutive letters; and that he, witness, was in the store as clerk in 1842, in September, about 30 days; that those in the store engaged in selling those goods, were Thomas Hersey, S. C. Hemmenway, and himself; that they sold about one hundred dollars a day for cash, and about one-third as many on credit. The goods sold for cash were at a profit of about 20 per cent. Hemmenway was all this time insolvent. On cross examination he stated the sign was Wm. H. Hemmenway & Hersey, in the fall of 1842. On Hemmenway's sign was the word "Agent," in small letters. That he was the agent, selling goods and doing business in that store, so far as witness knew by the word "Agent" on the sign. That the word "Agent" was three inches, and the sign eight feet long. Subsequently, and after the defendants had gone through with their testimony, he was recalled, and testified, (subject to objection,) that as well as he could judge, said Hemmenway, from the year 1835 to July, 1842, sold, on an average, $15,000 of goods per year. He did not see the word "Agent" on the sign until after one year.

The plaintiff then introduced the disclosure of Stephen Gale, as follows, viz.:—

"District Court, Western District, June Term, 1842. Am acquainted with the defendant in this suit. Said defendant is a brother-in-law of mine. Am not in any way connected in business with said Hemmenway. I gave an instrument in writing to said defendant two years ago. What sort of an instrument it was, or what powers I gave him in that instrument I do not remember. I do not know what this was given for, but said Hemmenway thought it necessary for his transactions in business, and I therefore gave him this instrument; and I have no copy of it, and have not seen this instrument since I signed it. Don't know that I gave the instrument any perusal before signing it. Might have given it a cursory reading, but I had great confidence in him, and therefore signed it. There was no consideration given me for signing said instrument, but what I did was from motives of friendship to aid him. Have never made any claim to any of the goods which said Hemmenway has in his possession since I gave the

instrument above mentioned. Do not know what those goods are, and have never been in Bangor; and have no interest in, and have never taken any of the profits arising from the sale of goods which said defendant may have sold. Don't know what sales or purchases said defendant may have made; though he may have made some statements to me in relation thereto. Cannot say that he ever showed me any bills of parcels thereof. Said Hemmenway is engaged in the hatting business. I am not at all acquainted with the hatting business. I never bought any goods which he has had for him. The instrument before spoken of was given by me to said Hemmenway at his request. (Signed) Stephen Gale.

"Cumberland, ss. Personally appeared the above Stephen Gale, Esq., and made oath that the facts contained in the above disclosure, by him described, are true. Before me, Oliver G. Fessenden, Justice of the Peace. June 23, 1842."

As trustee in an action, Allen Gilman against S. C. Hemmenway and Stephen Gale, trustees, and also the writ with the record of the court to which the writ was returnable. The record to be copied and made a part of the case. The writ is to be copied and made a part of the case.

Plaintiff then called Thomas Hersey to produce and prove a bill of sale from said Gale to himself; and he was sworn and proved the paper. The defendants then claimed the right to cross-examine the witness to the whole case. The judge ruled that they could not cross-examine the witness except as to the matters to which he had testified on the direct examination, and that if he wished to examine him as a witness, to make out his own case, he must wait till after he had opened his case and call him again. And the court further ruled that the plaintiff having called the witness and examined him, could not discredit him, by any evidence tending to show that he was not a creditable witness; and the bill of sale proved by Hersey, and which may be referred to, was then put in. Plaintiff then stopped, and the counsel for each of the defendants severally moved for a non-suit.

Thomas Hersey was then recalled by the defendants, and stated the goods were in No. 1 Main street, kept by S. C. Hemmenway, as agent, when Gale came to Bangor and took possession, July 22, 1842; the schedule contains all the stock then in the store; the prices in the bill of sale are the true prices— the prices I paid. Most of the goods were taken at cost; very few, some old hats, at less than cost; some put down at more than cost; the cost, by the marks and examining the bills. I took possession and held it from time of bill of sale. Had dealt in such goods four years. I paid full market price for those. Had been in the store then as clerk nine months. The business was conducted in the name of S. C. Hemmenway,

agent of Gale; sign, "S. C. Hemmenway, Agent." There was money and accounts due at the time of sale; cash, about $900. Gale made me his agent to close the concerns. I gave Gale four notes for the stock as stated in the bill, for $4719.20. Those notes have been paid by taking up Gale's liabilities. I took possession of all the assets in the store as Gale's agent; cash, $938.52, and bills due, on which I had collected 1399.95. The cash on hand was endorsed on Sarah Shaw's note against Gale, by me, in July 23, 1842. Cash collected on bills was paid on Gale's liabilities. My notes were taken up in the same way; as fast as Gale's liabilities were taken up by me, they were handed him and endorsed on my notes. Here was put in, and sworn to by witness, a written statement of moneys paid by Hersey; the stock, money, &c., amounted to $7057.67; all that I have paid away as before stated, to discharge Gale's liabilities. There are some accounts on hand not good. No other property in my hands. All the assets of the store came into my hands. I know the fact from my position as clerk.

Plaintiff cross-examines. Bill produced is the bill of goods I purchased of Gale; don't know whether copy now shown me as such, is a copy of my deposition. Can't say whether the answer shown me was my answer or not, nor whether I made out a schedule to annex to that deposition. Was before Col. Parks to give deposition. Was questioned concerning my private business and refused to answer. I don't remember of stating that the bill of sale was lost, nor whether deposition was taken in 1842 or 1843. Was not present when S. C. Hemmenway was examined before Parks. Don't remember of stating to Ingalls that S. C. Hemmenway made $2000 per year. Gale was at Bangor, during the time of sale to me, two or three days. I was not employed as clerk by any one in particular. Stopped here (Portland) on my way down to Bangor, and had some talk with Gale about going there; no deduction has been made for my services on my notes; no settlement has been made for those services. I took what I wanted from the store; shall be twenty-five years old next month. Had less than $100 when I went to Bangor.

Defendants resume. Gale, who is an apothecary, and resides in Portland, and S. C. Hemmenway, each married a sister of mine; and Sarah Shaw is the mother of Hemmenway. I was out of business at that time. Stopped here at Portland a week. Talked with Gale. Went to Bangor; stopped eight or nine months; came here; went to Boston; came back; talked with Gale about buying. I went into the store because I was out of business. Lived in S. C. Hemmenway's family. Took from the store what I wanted for expenses; don't know how much. I was twenty-one years old at that time. S. C. Hemmenway said he should like to have me stop, he had not help enough. It was Nov.

1, 1841. I refused to answer before Gorham Parks by advice of M. L. Appleton, my counsel. My deposition was never completed. My deposition was afterwards taken before N. Hatch. Schedule was called for on that deposition. I made it in 1843, from the bill of sale I had. Wm. H. Hemmenway and I constitute the firm of Hemmenway & Hersey. (Articles put in.) Moved this stock from No. 1 Main street to No. 19 West Market square, I think in September; formed copartnership Oct. 12, 1842. I put in the firm this stock I purchased of Gale, and put in $2000 in money which I borrowed of Augustus Hemmenway. All the capital I put in was borrowed. Wm. H. Hemmenway put in, in all, $1000. Hemmenway & Hersey owe about $11,000 for borrowed money. We buy goods sometimes on credit. Our stock averages about $4500. Our stock was at the time stated at $20,000. When I said $4500 I referred to stock in No. 19 West Market square. We now keep in No. 20 Main street. S. C. Hemmenway has no interest in our firm, has put in no capital. Gale has no interest.

Power of attorney, put in by defendants, from Gale to S. C. Hemmenway, dated Oct. 13, 1838, which may be referred to.

Depositions were next made.

Augustus Hemmenway was next called by the defendants, and testified as follows: I am a brother of S. C. Hemmenway. I resided in Chili, Peru and adjoining countries, from 1828 to February, 1838, remaining in the United States nearly the whole of 1838; then went again to Chili and returned to the United States in February or March, 1840. My business residence is in New York, but a large part of my time is spent in Boston and neighborhood. Since my return from Chili I have spent the winters in Cuba. I loaned money to Gale in 1838, in September or October, immediately before I left for Chili, and took a note for the amount. The note now shown me is the same. The date is Oct. 21, 1838, and the amount $1800. It was paid August 21, 1845, with $630 interest. The loan was made at the date of the note, and to Samuel C. Hemmenway, who showed me a power of attorney from Gale to him before I made the loan. The power of attorney now shown me is the same, (the one in the case.) The loan was made as capital to carry on business in Bangor, where my brother was agent. I hold another note, dated soon after my return in 1840. The loan was made in the same way, for the same purpose; and the note for the amount ($600) was signed "S. C. Hemmenway, agent for Stephen Gale," and is now unpaid. The first mentioned note was paid by a note of Hemmenway & Hersey for $1800, and a new note signed by Gale for the interest, $630. In 1838, on my return to the states, I found S. C. Hemmenway destitute; he was a clerk in a hat store in Boston, and separate from his family. His wife and child had gone home to her father's to live. He applied to me for

assistance. I gave him money for his immediate necessities; small sums repeatedly during the eight months I was at home; but declined to set him up in business. He solicited me repeatedly to do something for him. I went to see some of his creditors who did not become parties to the assignment, and tried to purchase his debts, but found I could do nothing. I was a creditor myself to the amount of $3000 when S. C. Hemmenway failed in 1836. My agent came into the assignment, and received the dividend, about 50 per cent. I allowed my mother from four or five to eight hundred dollars a year during all the time of my absence; sent sometimes specie and sometimes drafts. I have ever since allowed her as large or larger sums. My mother has no property, to my knowledge, save what I furnished her. Hemmenway & Hersey have a permanent loan of me of $10,000 now. I loaned Hersey $2000, just after he purchased Gale's stock; and Wm. H. Hemmenway $1000, when he went into partnership with Hersey. These loans have been increased, until now it is $10,000. It has been a consideration in these loans, that S. C. Hemmenway should be employed in the store as clerk, and have a living. S. C. Hemmenway is the most competent and active business man. My motive was to secure support for him and his family. On cross-examination he testified that the note shown him, dated in 1835, and signed by S. C. Hemmenway, was for money loaned Hemmenway at that time, and was sent from Cuba in a letter; it is my hand-writing. I was worth not less than $200,000 at the time of the first loan to Gale, and am now worth $400,000. The note for $2000, of Hersey, was not collateral. The money for the $3000 loan was sent to B. Bangs. The money passed through his hands. Direct examination resumed. The first dividend of 40 per cent., and the second of 10 per cent., were paid to B. Bangs for me. Immediately after my return it was stated to me that something more might be coming, a mere trifle; and S. C. Hemmenway requested an order for it. I gave it to him as a gift. I sent a special power of attorney to Bangs when I heard of S. C. Hemmenway's failure, thinking it might be necessary. The dividends were credited by Bangs to me in account current and with account of voyage of ship "Pearl." The account was sent to me at Valparaiso.

The defendants here offered to introduce the original petition of S. C. Hemmenway to be declared a bankrupt, together with the schedule annexed; but the plaintiff objecting, the court observed that schedules were not evidence for defendants, (containing the defendants' account of this business;) that the petition was evidence; and if the plaintiff did not put in the petition, the defendants could ask the opinion of the court, when the evidence was out, or ask instructions to

the jury whether the plaintiff had shown any right to sustain the suit. The defendants' counsel also introduced the notes of Mrs. Shaw, which may be referred to and are made a part of this case.

The depositions of the following witnesses were put in by the defendants, for the purpose of showing that the goods furnished the store in Bangor, from 1838 to 1842, were furnished on the credit of Gale, and may be referred to, viz.: Martin Bates, Jr.; S. W. Olney; Edward P. Porter; O. N. Towne; J. M. Sherburne; Charles A. White; Anson Dexter; W. A. Fisher; William Parkman; Isaac Lothrop; N. Carpenter; S. C. Perrin. The plaintiff introduced an execution in favor of Hastings Strickland, and a note dated July 16th, 1836, for $210, signed by S. C. Hemmenway, on which the judgment was founded. Also, a note payable to Arad. Thompson, and endorsed to Allen Gilman, which note may be referred to. S. C. Hemmenway's assignment, dated July 25th, 1836, was next introduced, and is a part of the case. Also, Samuel Sylvester's deposition (under objections), which is made a part of the case. And then called Joseph Bryant, who testified that he was one of the assignees of S. C. Hemmenway. That soon after the assignment, several individuals called upon him, and said that they owed accounts to said Hemmenway; when, on turning to the books, they appeared to be balanced by cash, without any date; and that no corresponding entries could be found on the day-book.

The defendant's counsel objected to this testimony, without the production of the books;—the books being in the defendant's possession.

The counsel for the plaintiff was then proceeding to interrogate him in relation to the abstraction of goods assigned by said Hemmenway, for the benefit of his creditors, when the counsel for the defendant, Gale, objected to the testimony, as being transactions previous to the power of attorney; and the counsel for Hemmenway objected to the testimony, as being immaterial. The counsel for the plaintiff stated his only object in introducing the testimony was to show that Hemmenway had funds of his own, to transact business, in 1838; and to rebut defendant's testimony that he was poor; and said, they did not claim this as testimony against Gale, unless they so connected Gale with Hemmenway, as to make him, by law, responsible for the declarations and acts of Hemmenway, and the court admitted the testimony. And the witness testified, that about ten days after the assignment, he went into the store where the goods assigned were stored, and found Hemmenway and his mother there. They had a large quantity of goods laid out on the counter. That he was trying to find a piece of silk which some one wished to buy; asked Hemmenway where

it was; he replied, that his mother had got it; inquired of him how he got into the store, and he replied, that he had a duplicate key. That they took, without his knowledge, several hundred dollars; that Mrs. Shaw became a party to the assignment, for the whole of her alleged claim—being about $2,300; that these goods were never paid for, nor allowed for, in any way; that it was an unpleasant affair; that Hemmenway said his mother had been stripped of all, by his failure. On cross-examination, he stated that he never made any claim on the debtors whose accounts were balanced; nor did he endeavor to compel Hemmenway, or Mrs. Shaw, to pay for the goods. That the reason was, that he had to do with a woman in tears; and that he consulted with a committee of the creditors, under whose direction he acted. That he took away, without his knowledge, from $500 to $1,000. He could now only remember some three or four articles—such as two pieces of Cashmere shawls, and some other things. That he put a new lock on the door immediately. That he made no charge of things so taken. That the amount allowed Mrs. Shaw was $2,336.29; that was allowed by arbitration.

The plaintiff then introduced the deposition of Daniel P. Wood, which was objected to, but was admitted. But no objection was made to the form of taking the deposition, it having been thus taken by agreement of counsel; and the same is made a part of this case.

S. P. Dinsmore, called by plaintiff, stated that he was here as a witness, in May last. Went down in steamer with S. C. Hemmenway; don't recollect any remarks of S. C. Hemmenway. Mr. McCrillis was talking with Smith; S. C. Hemmenway joined in the conversation. In reply to some remarks of McCrillis about Gale, he said, he, (Gale,) did not care a d—n for the whole scrape; he would not quit his shop for the whole scrape.

A. S. Richmond was next called, and was objected to by the defendants, but admitted against Hemmenway; and who testified that he sold S. C. Hemmenway, for cash, six or seven years ago; don't recollect that he ever told me he was agent. Moved to Bangor last November; made a sale to Hemmenway & Hersey, last fall, of $2,700, mostly for cash; one note, rest for cash; then I talked of going to Bangor; most of my conversation was with S. C. Hemmenway. I said I hadn't means; they said they would furnish me means. S. C. Hemmenway was the principal man, so far as I was concerned or observed. I found out William was partner, in February. William spent most of his time cutting buffalo coats, till February; since then, little time. Have heard S. C. Hemmenway talk of this suit. We were riding by Allen Gilman's house; said something about Gilman's suit; he said he would fight till he spent $10,000, before he should get anything; he made $4,000 or $5,000 the year before. Cross-examined. Made my contract with Hersey & Hemmenway; considered them to be the other party; supposed S. C. Hemmenway to be a party; last conversation, when contract was closed, was in Hersey & Hemmenway's store; S. C. Hemmenway and Hersey were present. T. G. Sampson came over with me, and came into store at time; can't recollect whether William was present, or not. Hersey & Hemmenway bought the $2,700 last year; the goods were on east side, (of the Kenduskeag;) have no recollection of going with William alone; went with S. C. Hemmenway, and William, together, (to see the goods;) don't recollect that William made any offer. I resided at Winthrop all the time I traded with S. C. Hemmenway; don't know as I have (any) quarrel or difficulty (with S. C. Hemmenway.) I took advice of counsel and left their store. Direct. S. C. Hemmenway asked me what I was summoned here for. I told him that I was here to testify that they had wronged and injured me; but I didn't come here for revenge, or to gratify my feelings. Hemmenway said his situation was such that he could not be a legal partner, and that his case was as straight as a gun. Cross-examination resumed. Signed bills to S. C. Hemmenway, as agent. First, February 12th, 1842. Second, June, 1842. The bills put in may be referred to.

George Gibson was called by the plaintiff, and objected to, but was admitted against Hemmenway. Testified that S. C. Hemmenway had as much to say about sale (of Laban Hersey's stock,) as any one else. Bryant & Son came to buy; were to have it at ten per cent. Hersey & Hemmenway asked twelve. S. C. Hemmenway said it made no difference whether they sold at ten or twelve, if they had a day or two to mark up; and were marked up. S. C. Hemmenway asked me since I came here, if I did not know he acted as agent when he kept in No. 1. I told him I knew he had a tin under-sign lettered so. S. C. Hemmenway said he was not a partner, but confidential clerk (of Hersey & Hemmenway.) I told him I knew William and Hersey were in the firm of Hersey & Hemmenway. Stock of Laban Hersey was part of stock of Wellington—such goods as Hersey & Hemmenway did not keep.

C. A. Richardson testified, under objections, that he was in Hemmenway & Hersey's store five months. Can't say what part of the time William Hemmenway was there; have seen him there; not so often as the others; rather seldom. Also, that he and Hersey had some difficulty about a bench; that said Hemmenway came over to arrange it; and that he asked him if he, Hemmenway, did not sanction what Hersey done in the business of Hemmenway & Hersey. He replied: "Not by a good deal; that he was boss, or master of that concern; that his family, and not Hersey's represented the capital in that

concern." This testimony was objected to, but was admitted as against Hemmenway.

John B. Norris testified that he had been a clerk in that store (Hemmenway & Hersey's) about nine months, and until about a month since; that S. C. Hemmenway and Hersey were the principal men in that store; that William H. Hemmenway was not in there more than a tenth part of the time; that when inquiries were made there for him, S. C. Hemmenway told them that they would probably find him at Vinton & Porter's who kept a restaurater.

The defendants resumed, and called William H. Hemmenway, who testified as follows:—Hersey and I are the firm of Hemmenway & Hersey. No other person is in it. S. C. Hemmenway never had any interest in the goods, or capital. I put into the firm $1000, which I borrowed of Augustus. We had no real capital—none but borrowed. We owe, for loans of money, something rising $12,000. I am in the store every day when in town—not constantly—and have taken part in the control and direction, ever since I signed the articles of copartnership. I have no other business. I talked with Richmond, before the purchase of him; went over to see the goods, with him; examined them, and made him an offer, which he finally took. At the same time there was conversation about his coming to Bangor. On Sunday, (the other conversation spoken of,) there were present, S. C. Hemmenway, Hersey, Richmond, Sampson, and myself. I settled Mrs. Shaw's claim on the assignees, and they were allowed $337.82, for goods from the store; no other claim was made for goods so taken. S. C. Hemmenway was the agent of Gale. I was in Bangor then; often in his store. His stock, I think, would hardly average $4000; chiefly hats and caps, and in the winter, buffalo robes. It increased $1500 or $2000, gradually, during the last eighteen months, in furs, boots, &c. On an average, it would be well to sell $10,000 or $12,000 a year, on a stock of $5000. The sign was "S. C. Hemmenway, Agent." The business was conducted as Gale's, so far as I knew. Cross-examined. S. C. Hemmenway bought some furs.

Thomas Hersey re-called by defendants, who testified that since testifying before, he had examined the account, (exhibited by him,) and found an error of $100, in amount collected of O. N. Towne. His account should be $500; and $3.00 collected of Stillman Wilson. Of the money paid by him (to discharge Gale's debts), some was paid into the bank; some sent by S. C. Hemmenway; some by mail. That his sales, when O. H. Ingalls was in his store, a week or two, were not more than $60.00 per day. That the profits in store No. 1 Main Street, under S. C. Hemmenway's direction, were about $1000 or $1200 a year; average profits on sales, twelve and a half to fifteen per cent. The stock would average $4000, or a

little more. Cross-examined. He said he had examined the books since his former statements. The mistake was in making up the list of accounts, not in settling.

Oliver Fessenden was called by the defendants, and testified that the disclosure of Gale was written by him from the account of Gale; that it was written in Gale's store, in Portland; that he had no counsel present; that he advised him to call on C. S. Daveis, Esq., his counsel; and he went for him twice, but not finding him, concluded to proceed; that after it was written, he read it to Gale; that Gale took it and read it, and said it was right, and signed it, and swore to it.

The assignment of 1836—the copies of Mrs. Shaw's notes, may be referred to. Also, notes to Augustus Hemmenway. Also, the records of the district court, showing that William H. Hemmenway is a discharged bankrupt. And also, the schedule of accounts referred to by Hersey.

After the testimony was closed, and before argument, Hemmenway's counsel contended to the court, that there was no evidence of conversion by his client, and asked its direction accordingly; and Gale's counsel took a similar position, and made a similar request in regard to his client.

The court instructed the jury, that if they were satisfied, that in 1838, when the power of attorney was given by Gale to Hemmenway, that Gale consented to give it, and Hemmenway to take it, with the intention that Hemmenway was to do business on his own capital, and for his own benefit, and that it was only a blind, set to deceive the public and defraud creditors, and Hemmenway did business on his own capital for himself;—that then it was evidence, and strong evidence, of fraud. Second. That if Gale sold the property to Hersey after it had vested in the assignee by the decree of bankruptcy, it was evidence of a conversion. Third. That if the property was Hemmenway's, and Gale sold it by a contrivance between him and Hemmenway, and at Hemmenway's request, to put it further beyond the reach of his assignee, it was evidence of a conversion by both Hemmenway and Gale.

The jury returned a verdict for the plaintiff, for $5,309.10.

The defendants moved for a new trial. First, because the verdict was against the weight of evidence. Second, because the judge who tried the cause made several rulings as to evidence, and gave several directions to the jury which were erroneous. They also filed a motion in arrest of judgment.

Rowe and Chas. S. Daveis, counsel for these motions, in behalf of defendants.

McCrillis and Deblois, for plaintiff, and against these motions.

WOODBURY, Circuit Justice. The questions raised in this case under the motions for

a new trial, and in arrest of judgment, are numerous; and some of them possess no little difficulty. But having been ably argued, the labor of the court in disposing of them will be much lessened.

The first ground assigned for a new trial, is, because the verdict is supposed to be against the weight of evidence. I have had occasion to examine fully on the last circuit and to deliver an opinion, laying down what seemed to me, after a full consideration, the true guides or limitations as to this ground for a new trial. See Fearing v. De Wolf, R. I. Dist., Jan., 1847 [Case No. 4,711]. See, also, 16 Me. 200; 19 Me. 402; 20 Me. 349. I see nothing in this case which can bring it within the fair exercise of the power of the court over this subject as it has been there defined. There was evidence on both sides to be weighed. Here no great preponderance existed on either side, if we look to the extraordinary disclosure and disclaimer of Gale, under oath in the trustee suit. At all events there does not appear to have been so clear a mis-trial as to evince plain mistake, or an abuse of power on the part of the jury. These are considered by me as the true tests. The cases and reasons are fully presented in Fearing v. De Wolf, to show the propriety of refusing to disturb verdicts when thus situated, merely because the judge who tried the cause may think that he would have decided differently on the matter, had he been in the jury-box, to respond to the facts, instead of being on the bench to respond to the law. But if the weight is so clearly and decidedly in favor of one party as to render it probable that a real mistake has happened, or a wanton abuse of power, it is the duty of the court not to correct the result by deciding the facts differently from a jury, but to let another jury pass upon the facts, and settle the question whether there has been either a mistake or an abuse of power. In this way clear mistakes and clear abuses can be corrected as such should be, but without the court assuming the province of the jury. They merely permit the second jury to revise the doings of the first one.

The next reason assigned for a new trial is the refusal of the judge to nonsuit the plaintiff on motion of the defendant, though against the consent of the plaintiff and after the plaintiff had furnished evidence which he deemed material, and on which he wished the jury to act. A practice has grown up in some states for courts to nonsuit plaintiffs against their consent, and after they have presented testimony which they wish the jury to consider, provided the court entertains opinions on the law unfavorable to the plaintiff. But it is not deemed sound practice in the courts of the United States; and, instead of it, the evidence is there allowed to be passed upon by the jury, whenever once admitted as competent, but under instructions to which the defendant can except if not satisfactory to him, and thus obtain all the benefit to be derived from a nonsuit with an exception

made by the other side. The cases are mostly collated on this point in Folger v. The Robert G. Shaw [Case No. 4,899]. See, also, [Crane v. Morris] 6 Pet. [31 U. S.] 598, and 1 Pet. C. C. 497 [Conn v. Penn, Case No. 3,104]. The verdict, therefore, cannot be set aside on this ground.

Another reason assigned for a new trial, is the admission of improper evidence in Ward's deposition as to declarations made by Hemmenway, one of the defendants, in a quarrel with Gilman, his principal creditor. But it seems to me that those declarations of H. are competent, which tend to make himself liable in this action, where he is a party, like the admission of any other party. In that view they might properly be introduced, when had they been offered as to a remote transaction, in order to strengthen the title of the plaintiff as assignee of Hemmenway, and in a suit where H. himself was not a defendant, they probably would be inadmissible. They would then not be made at the time of the transaction. Broom, Leg. Max. 441, 442, 5 Durn. & E. [Term R.] 512; 6 East, 191; 9 Bing. 352. And hence not a part of the res gestae, and they would be in favor of his own interests as in part represented by his assignee. 9 Ves. 83; Greenl. Ev. §§ 189, 190; Eden, Bankr. Law, 361. When we consider, however, that here he is personally a defendant, attempted to be charged as a joint trespasser in respect to the property in dispute and to the injury of his creditors, the declarations assume a new aspect and are entirely competent against himself and to help render himself liable in the present suit.

The next reason for a new trial is on account of evidence, admitted in respect to alterations in Hemmenway's books, when the books themselves were in court. This objection is defective on two grounds. First. The evidence did not relate to the contents of the books, with a view to prove by parol, charges or credits existing in them in writing. But they related rather to alterations seen in them and accounts entered as balanced, when in fact they had not been, and this done so as to prevent the assignee from collecting them and to enable the bankrupt to obtain them himself of his debtors by their voluntary payment, in fraud of his own creditors. Secondly. The evidence as tending to show receipts of money by H., and means to buy this property, was competent on that ground, as a general principle; and if any of this evidence was objectionable, because relating to what was in writing, that part should have been separated and specifically resisted, and the rest allowed. For example, allowing proof of the mere receipt or collection of money by H., after his first failure, seems unobjectionable. Finally. When this whole evidence was excepted to, and notice given to produce the books, and they were not unconditionally produced, parol evidence of their contents seems of course

to be admissible. In this case, the books were in court on a notice to produce them, but were offered only on condition that the plaintiff should use them in evidence. But I am not aware of any right in a party, under a notice to produce books or other writings, to make conditions to their production The rule is absolute to bring them into court for the benefit of the other side, and to offer them so without reserve; and it is for the other side, after obtaining possession of them, to decide whether it seems expedient or not to use them as evidence. This proceeding, however, would have one effect on the other party, imperatively, or at all events, if the books were unconditionally offered. It would prevent the further use of parol evidence by him after written evidence of the same fact is produced and placed in his possession, whether he chooses to use the written or not. Were this objection stronger there is understood to be another answer to it. It seems questionable, on inquiry, whether the judge who tried the case gave any ruling on this point; or if he did, whether any exception to it was then taken, as it must be in order to be available under this motion. [Poole v. Fleeger] 11 Pet. [36 U. S.] 185–211. It is a little extraordinary, also, that the defendant himself did not use the books as he might, if they contained matter disproving what was testified to on the part of the plaintiff.

Another ruling is objected to, which excluded the defendant, Hemmenway, as a party, from putting in his own explanatory statements as to the title to the property in controversy, and which were contained in the schedule annexed to his petition. It is stated in connection with this, that the petition itself, without the schedule, was allowed to be admitted. I am inclined to think, that the whole record in the proceedings in bankruptcy was competent evidence, including the schedule annexed to the petition. 1 Mass. 67; 2 Mass. 492; 1 Story, Eq. Jur. § 160; Greenl. Ev. §§ 506, 511; 1 Story, 478 [Bright v. Boyd, Case No. 1,875]; 3 Mer. 667; [Ferguson v. Harwood] 7 Cranch [11 U. S.] 408. But, at the same time, it seems to me that the bankrupt, when a defendant in a suit, cannot be permitted to use in his favor his own declarations as to the title of property which is disputed; and that the judge ought to charge the Jury not to give weight to any such declarations in a suit like this, when obliged to be let into the case as a part of a documentary exhibit. As this view, then, would lead to the same result in respect to the verdict as the ruling at the trial did, which entirely excluded the schedule, it furnishes no sufficient ground for a new trial. See cases showing that mere technical exceptions are insufficient, if the verdict has probably not been affected by the ruling. Allen v. Blunt [Case No. 217]; Broom, Leg. Max. 156; 12 Adol. & E. 631. De minimis non curat lex. Cro. Eliz. 353.

An objection has been alluded to by some of the counsel, as to the calling of Henesey, one of the witnesses, a second time, and the effect of his cross-examination by opposing counsel, on points not questioned about on the part of the plaintiff. But, as the other counsel waive that, it is not necessary to go into an examination.·

Another objection to the verdict grows out of the peculiar situation of the property in controversy, and the alleged want of title or possession, in the plaintiff, sufficient to enable him to sustain trover; the present form of action against any person. But it is to be remembered, that Hemmenway, the bankrupt, was in the actual possession of the property, in June, 1842, the time of the alleged conversion; and, also, in July, 1842, when the goods were, in fact, handed over by him to Gale, the other defendant, and placed in the charge of third persons. This possession was prima facie evidence of title in Hemmenway, as he had bought the goods —had, for some time, controlled them—and had been selling articles out of them, for several months. Standing alone, this possession would have been sufficient to enable the assignee to sustain trover against third persons. But it did not stand alone at the trial; various proofs being offered to show that the possession was had by Hemmenway, as agent for Gale. Nor was the action brought against third persons, but against the agent and principal, who set up the possession to be in behalf of himself, and not the agent; and the title, also, to be in himself. This was a permissible defence; and if it had been made out satisfactorily, would have defeated the action. While, on the contrary, if not so made out, but the jury believed the possession was, in reality, for Hemmenway himself, and the title was in him, so far as regards his creditors, the action by his assignee, was, in these respects, and, under this objection, well maintained.

The great contest before the jury was, therefore, in relation to these points; and they having returned a verdict for the plaintiff, it is conclusive—if no misdirections were given—that due possession and title existed in Hemmenway at the time of the conversion, so as to enable his assignee to protect the property against any wrong-doer. If the court gave any erroneous instructions to the jury, on this matter, they can be pointed out and corrected; but if not, the verdict, while it stands, is decisive against this objection. The instructions are embodied into the report of the case, and are understood to be not excepted to, and hence need not now be re-examined.

Next, it is argued, that H.'s interest in the goods was only as a trustee, and that property, held in trust by a bankrupt, does not pass to an assignee; so that no suit, whatever, can be brought by him. But this is not correct. It passes, though held in trust. Yet, a new trustee will usually be afterwards

appointed, and the property conveyed to him by the assignee. See on this, 6 Geo. IV. c. 16, § 79; 2 Deac. 151; 3 Mont. & A. 487; 1 Spence, Eq. Jur. 504. Here, however, the jury have found the trust in this case to have been a secret and fraudulent one; and the property really belonging to Hemmenway; and in such case, even in England, the property vests in the assignee, absolutely. So it does there, always, when the property was, by consent of the owner, in the possession and control, and disposition of the bankrupt. See cases under 21 Jas. I. c. 19; Cooper v. De Tastet, 2 Moore & S. 714; 1 Deac. 131, 166; Almy v. Wilbur [Case No. 256]. But this last may not be the true construction of our late bankrupt law; and whether it be or not, this objection must, for the other reasons, fail.

Another exception has been made, that proper evidence of a conversion was not offered. But if the jury was satisfied that the property in the goods was in Hemmenway, as principal owner, before becoming a bankrupt, and the pretence of title in Gale was fraudulent; then the removal of this property to another place, by Gale and Hemmenway, jointly, and doing this as if it belonged to Gale, as principal; and if Hemmenway, as his agent, engaged afterwards in using and selling it as Gale's property, this was a misfeasance and a conversion. If a creditor merely accompany a sheriff's officer to levy on goods, which afterwards prove to belong to another, as here, to the assignees and not to Gale, he is liable in trover, though he took neither the goods into his own custody, nor their proceeds. Menham v. Edmonson, 1 Bos. & P. 369. It is an aiding or abetting in a tort—a co-operation in a removal and use of property, over which no right to do so existed, and that is sufficient to constitute a conversion. See cases cited in Smith v. Smith [Case No. 13,109], Sept. term, 1849, Maine Dist., note.

The chief question remaining, is the motion in arrest of judgment. It resolves itself into two objections. One is, that the assignee cannot sustain proceedings like this, as to the property of the bankrupt, except in the district court sitting in bankruptcy; and the other is, that he cannot, in such a case, or, indeed in any case, sustain an action at law against the bankrupt himself. In respect to the first objection, it is manifest, that by the 6th section of the bankrupt law, the district court has jurisdiction, in a summary way, "in the nature of summary proceedings in equity," over all controversies between an "assignee and the bankrupt." 5 Stat. 440. But it is equally clear, that if the assignee chooses to resort to an action at law, rather than "proceedings in equity," against adverse claimants, the 8th section confers "concurrent jurisdiction" over it, in the circuit court. That section, indeed, goes further, and confers such concurrent jurisdiction in all suits, both "at law and in equity, which may, and

shall be brought by any assignee of the bankrupt, against any person or persons claiming an adverse interest." It is not to be questioned, then, that this action well lies in this court, if the assignee elects to come here against Gale. Lucas v. Morris [Case No. 8,587]. He is, manifestly, a person claiming "an adverse interest." If these parties lived in different states, so as to give this court jurisdiction on that ground, this subject-matter might, for aught I see, be settled in it, as it might be in a state court, if the action be first brought there. And the adjudication first had, either in a bankrupt court or another, will bind as to the right of property, or a lien. Peck v. Jenness, 7 How. [48 U. S.] 612; Ex parte Christy, Justice Catron dissenting, 3 How. [44 U. S.] 292. It is within the language of the bankrupt law to sustain it in action against ·Hemmenway, also, if claiming "an adverse interest" as to this property, against his assignee. This he does claim, as an agent of Gale. This he attempted to aid Gale to enforce, and this made him a wrong-doer, if Gale was. It comes, then, within the spirit, as well as words, of the act giving this court jurisdiction. He sought to remove this property from the reach of his creditors. He co-operated in trying to secure the adverse claims of third persons; and he ought, therefore, in justice, as well as law, to be jointly answerable with them for damages, when the title of those third persons appears by the result of the trial to be defective.

It is important, in this view, to regard critically the data. Hemmenway was decreed a bankrupt in June, 1842; and by that, ipso facto, all his property, under the express language of the bankrupt law, passed to the assignee. The jury have found this property to have been his; yet the next month after, in July, 1842, he proceeded to aid Gale in removing this property, as belonging to Gale; and in disposing of it as Gale's, rather than the assignee's, and this to the manifest injury of his creditors; and as the jury have found, with a view to defraud them. The remaining objection to his liability is, that whatever may be the legal or equitable considerations, to charge him, when Gale is chargeable, because he acted jointly with Gale in the conversion; yet no cases can be found and no principles exist, which render a bankrupt himself liable to his own assignee in an action at law. It is true that controversies between a bankrupt and his assignee are generally settled in the bankrupt court. But, as already shown, no principle exists which should limit the jurisdiction over them to that court in all instances. As much reason exists for a concurrent jurisdiction here, over suits between them, as for such jurisdiction there, over suits between them and others. Their disputes may be as important in both principle and amount as those in other cases, and hence be as suitable for a court higher than the district court. They may, when as

here, third persons are joint defendants with the bankrupt, be more appropriately prosecuted in the circuit court, as no reason whatever exists for forcing such third persons into the district court exclusively.

Finally, and above all other justifications for sueing here, is the circumstance that H. is not now prosecuted as "a bankrupt," in which capacity alone the district court has any peculiar jurisdiction over him, but as "a person," setting up an "adverse claim" on account of Gale; and is prosecuted here, like any other person, for a tort in his private and individual character. In England chancery often has concurrent jurisdiction with a court of bankruptcy. Meggison v. Foster, 2 Younge & C. Ch. 336. Or rather the lord chancellor has. Ex parte Lund, 6 Ves. 782. Nor is there any lack of precedent or principle to make the bankrupt liable to be prosecuted by the assignee in a court of law in appriate cases, though the instances are not numerous in the books which seem to be directly in point. But suppose the bankrupt should steal the property after it is in the actual possession of his assignee. He would doubtless be indicted in a court of law for the larceny of it as the property of the assignee, in his official capacity, for the use of the creditors. It is his in law (9 Ves. 83), and the bankrupt has no more right to take it away. clandestinely or animo furandi, than he had to do this with any other property. Again, if he seizes and converts such property to his own use, either alone or in conjunction with a third person, no principle seems to interpose to prevent his liability to the assignee in an action of trover. He is liable, personally, like any other wrong doer, and not in his capacity of bankrupt. Some error on this point has been caused by the common expression in the books, that a bankrupt is civiliter mortuus. 5 Mad. 289; 3 Mad. 158; 1 Holt, N. P. 172. But this means dead only as to the control of his old property and contracts. His assignee stands like an administrator in respect to these. But the bankrupt is still alive for other purposes in law as he is in fact. He is alive to acquire new property—alive to do and receive wrong—alive to commit trespasses or crimes—alive to be prosecuted for either, and to prosecute for either when committed on himself. Eden. Bankr. Law, 255; 7 Durn. & E. [Term R.] 391; 1 Bos. & P. 44. The following show suits at law between the assignee and the bankrupt himself in different forms, which generally were sustained. though not in all cases. Semble on leave perhaps; Benfield v. Solomons, 9 Ves. 83; 1 Hen. Bl. 437, note; Coles v. Barrow, 4 Taunt. 755; 1 Cooke, Bankr. Law (3d Ed.) 518; 1 Eden. 156; 6 Bing. 500, was to try the validity of the commission. The furniture of the bankrupt, reserved originally as well as his property acquired since, if trespassed on by the assignee, or others, must be capable of being protected by the bankrupt through ordinary suits of law. See Webb v. Ward, 7 Durn. & E. [Term R.] 296; and cases in Kitchen v. Bartsch, 7 East, 57, note; 1 Barn. & Adol. 574; 1 Esp. 140, 170; 4 Taunt. 754; 2 Rose, 277.

Another objection urged against these actions is, that a bankrupt has no property of his own to respond with in such cases. But poverty is no defence generally to actions for a tort. Beside this, property, such as furniture, &c., to the amount of $300, may be reserved to the bankrupt by the 3d section of the act. And, moreover, all his earnings and acquisitions, since the decree of his bankruptcy, belong to himself, here (Newhall's Case [Case No. 10,159]), though it is otherwise under the language of some other bankrupt laws, allowing him to acquire no property till after his discharge (1 Bos. & P. 44, and Kitchen v. Bartsch, 7 East, 53). The bankrupt is also entitled to the proceeds of his personal labor, and consequently can sue and be sued in the protection of them. 3 Bos. & P. 578. Again, it is urged, that the assignee can bring no action which the bankrupt himself could not bring. This may be true as to voluntary assignees. 7 Johns. 161; 6 Har. & J. 61; 10 Paige, 218. The 3d section of the bankrupt law gives some countenance to this view, by investing him with the power to sue concerning the effects of a bankrupt as fully as a bankrupt himself could at the time of the bankruptcy, and from this, it might be inferred, he could sue in no other case. But that inference is a non sequitur. The assignee is expressly clothed with certain powers, such as the bankrupt had, but beyond that, by force of the law vesting in him, "all the property and rights of property of every name and nature, and whether real, personal, or mixed. of every bankrupt," he may sue fraudulent grantees in order to regain property for the creditor. Though the bankrupt himself would not be allowed in such case to sue and avoid his own conveyances. See cases in Ashby v. Steere [Case No. 576]; and Leland v. The Medora [Case No. 8,237]; Winsor v. Kendall [Id. 17,886]; Wheelwright v. Jackson, 5 Taunt. 109; 1 Doug. 89, 295; 7 East. 544; 4 Burr. 2477; Bayard v. Hoffman, 4 Johns. Ch. 450; 10 Paige, 218; Frothingham v. Hayes, Merch. Mag. May, '46, 458. The assignee here, then, represents the creditors as well as the bankrupt; is an assignee by law and not a voluntary one, and acts for them and in their behalf, as far as the law permits. 2 Ves. 244; 2 Hen. Bl. 135; Eden, Bankr. Law, 213.

Having thus shown, that the bankrupt himself, if joining another person in a trespass on the property in the assignee's hands, is liable in an action at law for the tort by the assignee in behalf of the creditors, it becomes necessary to decide another question, made under this head, that this objection by the respondents comes too late, after a plea of the general issue and a trial on it. See cases on this, 1 Sumn. 578 [Wood v. Mann,

Case No. 17,952]; 2 Gall. 325 [Maissonnaire v. Keating, Case No. 8,978]; Conard v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 450; 1 Mass. 159, 483; 3 Pick. 232; 8 Johns. 378; 19 Johns. 300; 3 Fairf. [12 Me.] 384; 16 Me. 231.

Both of these motions are overruled.

[NOTE. See decision of Ware, District Judge (Case No. 2,434), which apparently was rendered on the same motion.

[For denial of a subsequent motion for a new trial on the ground of newly-discovered evidence, see Case No. 2,433.]